STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    daniel.pastor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JUVENCIO GAMEZ CID,<br><br>    Defendant. | NO. CR-20-450-EMC (JCS)<br><br>**JOINT DISCOVERY LETTER BRIEF ON DEFENDANTS' MOTION TO COMPEL (Case CR 21-26, DKT. 177)** |
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JUVENCIO GAMEZ CID,<br><br>    Defendant. | NO. CR-20-451-EMC (JCS) |

| | ) | |
|---|---|---|
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | NO. CR-20-452-EMC (JCS) |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCISCO RICARDO MIRANDA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Case No. CR21-026-EMC (JCS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAUDEL MACIAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## I. GOVERNMENT POSITION

During a wiretap interception that authorizes the collection of wire and electronic communications, the DEA receives responsive data in two streams from the communications provider. *See* 3:21-cr-26, Dkt. 180 ("Morton Decl.") ¶ 14. The first stream is sent to the DEA's wire collection communication system (the T2-S2 system) and includes information that providers are required to send in response to a Title III order and the pen register/trap and trace order, such as voice communications and Short Message Service (SMS) messages and associated metadata. *Id.* ¶ 15.

The second stream—the packet data stream—is transmitted to and from the target phone as packet data. Packet data includes a large amount of machine-to-machine communications encrypted mobile app data, encrypted web page and session data, as well as some easily readable data such as Mobile Messaging Service (MMS) messages. *Id.* at ¶¶ 8-10, 15. This stream includes information providers are required to send in response to a Title III order authorizing the interception of electronic communications and a pen register/trap and trace order.

In the packet data stream, law enforcement typically focuses on a target's MMS messages. MMS messages are text messages that contain pictures, videos, or which are group text messages. Under the Communications Assistance for Law Enforcement Act (CALEA), the government is prohibited from: 1) requiring a service provider to separate out MMS messages from the packet data stream and to supply only MMS messages; and 2) dictating the way packet data is delivered to the government. *See* 47 U.S.C. §§ 1001-1021. CALEA prohibits the government from requiring "any specific design of equipment, facilities, services, features, or system configurations to be adopted by any provider of a wire or electronic communication service," or from requiring "adoption of any equipment, facility, service, or feature by any provider of a wire or electronic communication service…." 47 U.S.C. §§ 1002(b)(1)(A)-(B).

Defendants concede that the packet data at issue here has been produced to them twice.[1] Packet data was first produced in the fall of 2021. Then the parties met and conferred. The defense complained that the files were difficult to review. In response to the defense's concerns, the government re-produced the same files in the ExportLite format in December 2021.

The ExportLite format makes an index list of the files viewable in a web browser such as Google Chrome and includes links to the underlying files and can be easily searched by file type (to find MMS messages, for example) or by date. The ExportLite format also has a column showing whether the specific file was marked Pertinent, Non-Pertinent, Unviewed (i.e. the file was not opened by a monitor), or Undecided. Dkt. 180 (Morton Decl.) ¶ 19. Defendants' Motion to Compel (Dkt. 178) misreads the language of the Title III order that is quoted at pages 14-15 of the Motion. The filter described in that language does not assign pertinence classifications to any data. Dkt. 180 ¶ 14. The filter avoids the government receiving two copies of certain types of voice calls. *Id.* Pertinence determinations were made by human monitors. *Id.* ¶ 13.

Defendants' expert declaration recognizes that packet data is "encrypted data, code, data packets, and network traffic . . ." Dkt. 181 ¶ 10. Nonetheless, Defendants speculate, without evidence, that the government's Coolminer software can somehow transform unreadable and/or encrypted content from the packet data stream into readable content or images. Dkt. 178 at 17. They further speculate that if only the defense were able to view the files in the DEA wire room, they might find grounds for suppression of wiretap evidence.

During the hearing on Defendants' Motion, the defense went even further, speculating—without evidence—that the packet data stream amounts to an image of the contents of a Defendant's phone as if the government had seized the phone and imaged its contents or someone downloaded the contents of the phone remotely. This speculation is not just technologically wrong, it is absurd. Telecommunications providers do not have an iCloud-like image of the contents of a mobile phone from the packet data stream that mobile phones create as they are used. Providers are not in the business of remotely hacking into their customers' phones to obtain the phones' contents. Photos on a mobile phone would only be intercepted during a wiretap if the phone's user texted a photo to another phone in the form of an MMS message.

Coolminer is a government software program used for viewing data received pursuant to a wiretap order. Dkt. 180 ¶ 2. It is not decryption software. Defendants' assertion that Coolminer

---

[1] Defendants incorrectly assert that they have not received the entirety of the packet data in the government's possession or have not received it in the format in which the Government has these files (Defense Dispute #2). The government has twice produced the entirety of the packet data files to the Defendants.

allows the government to read unreadable and/or encrypted content or encrypted data that is difficult or impossible for Defendants to read is false and baseless speculation. *Id.* at ¶ 10.

Defendants are correct that much of the data that has been produced from the packet data stream is machine-to-machine communications that is not understandable to the average person. *Id.* at ¶ 9-10. "The Government, however, is in the same position as the defense as to this data and does not have a way to decipher or more easily read it." *Id.* at ¶ 10. "The suggestion that Coolminer provides the Government with the ability to decipher or easily read this type of data is wrong." *Id.*

During the hearing before Judge Chen, Defendants disclaimed the idea that the Coolminer software has some sort of secret key that transforms unreadable and/or encrypted packet data into viewable content. This concession dooms the Defendants' argument. It acknowledges that the government is in the same position as the defense regarding unreadable and/or encrypted data and does not have a way to decipher or more easily read it. The very relief the defense seeks in its motion to compel – access to the government's Coolminer software in DEA controlled space – is thus not material to preparing a defense.

During the meet and confer on May 19, defense counsel requested that their expert be given access to the government's Coolminer software to review the packet data files on a laptop at the U.S. Attorney's Office. Government counsel investigated this idea but learned that Coolminer cannot be run from a laptop that is not connected to the central database core and file system in San Francisco. Viewing the packet data files in Coolminer has to be done from the wire room. The government opposes giving the defense access to the DEA wire room.

The packet data files have already been produced twice to the defense and are searchable in the ExportLite format. To search for MMS messages in the ExportLite html grid-view, a user simply has to hit "CTRL + F" and search for the words "MMS", "Mobile", or "MobileMessaging", which are terms that appear under the "Type" column of the ExportLite html grid-view. *See* Pastor Decl., Exhibit A (example of MMS message in ExportLite production).

In sum, Defendants have received the packet data files twice in discovery. The second time, Defendants received the packet data in the ExportLite format, which allows counsel to search the files easily by date or by file type to locate relevant MMS messages or image files. Defendants know which files the government believed were pertinent to the investigation. ExportLite has a column showing if the packet data file was marked Pertinent, Non-Pertinent, Undecided, or Unviewed.

Defendants have disclaimed the idea that the Coolminer software has a secret key that transforms unreadable and/or encrypted data into plaintext or viewable images.[2] There is nothing more the government is required to produce. "[I]n general, a defendant will not be able to make a prima facie case that disclosure of the government's confidential software is material to his defense if he cannot present a cogent defense theory, supported by some facts, which discovery

---

[2] Defendants wrongly suggest that the affidavit (Dkt. 208-1) in *United States v. Armando Gonzalez*, 20-cr-85-JCH (D. Conn. 2021) stated that Coolminer is decryption software. The affidavit in that case noted that when an MMS message is sent by an intercepted telephone, monitors receive an unreadable text message on the T2-S2 system used to receive audio and SMS communications from the provider. That, however, is an indication to the monitors that they need to review the packet data stream for an MMS message which is received on a separate system. These MMS messages are readable only in the packet data stream. They are readable in the packet data just as they are readable in the ExportLite format of the packet data produced to the defense in this case.

relating to the software would help develop." *United States v. Owens*, 18 F.4th 928, 940 (7th Cir. 2021).

"Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which tend to show that the government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990). In *Budziak*, for example, the Ninth Circuit explained that "[g]iven that the [child pornography] distribution charge . . . was premised on the FBI's use of the EP2P program to download files from him, it [was] logical to conclude that the functions of the program were relevant to his defense." 697 F.3d at 1112.

Here, the drug charges Defendants face are not premised on the DEA's use of the Coolminer software or even on the packet data files. Even if all of the packet data files were suppressed, the government's case against Defendants—which is based on the audio calls and SMS messages collected in a separate data stream from the provider—would be unaffected.

### Defense Position Re: Coolminer Discovery

In a series of Title III wiretap applications and resulting orders, the government collected wire and electronic communications from defendants as defined by 18 U.S.C. 2510, subd. (1) and (12), respectively. It is important to note that the definition of wire communications and electronic communications differ greatly within the meaning of Title III.[3][4] The applications seeking the orders state that wire interceptions (including SMS or Short Messaging Service messages) would be monitored by Task Force Officers, DEA agents, and other OCDETF agencies. Wiretap Application 1 ("TT1"), Exhibit 3, Decl. of DEA Task Force Officer Luis Leyva at ¶ 145. The interception of electronic communications were intercepted pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through the receipt from the service provider of "packet data," an electronic data stream. *Id.* at ¶ 147. Further, wire interceptions (telephone calls and SMS messages) are associated with one data stream and are collected and minimized in real time by human agents, while electronic communications ("packet data") cannot be minimized in real time. *Id.*

One problem with the collection of dual streams of data is that electronic communications include duplicates of wire communications already collected and minimized through traditional means. The affiant claims that to abide by the minimization requirements for wire communications, the DEA uses a "filter program in its electronic communication collection

---

[3] "[W]ire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce. 18 U.S.C. § 2510, subd. (1).

[4] "[E]lectronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include—
    (A) any wire or oral communication;
    (B) any communication made through a tone-only paging device;
    (C) any communication from a tracking device (as defined in section 3117 of this title); or
    (D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds. 18 U.S.C. § 2510, subd. (12).

system that will automatically identify, and block voice calls in the electronic communications packet data stream. *Id.* The remaining portion of the data stream is minimized by review over a secure system. *Id.* at 149. The affiant states that non-pertinent data will not be accessed by other members of the investigative team and that all intercepted text messages will be sealed with the Court upon the expiration of the Court's order authorizing the interception. *Id.*

A second problem is that while the government has stated that its interest in the data packet stream is limited to text messages (specifically MMS or multimedia messaging service messages), they concede that the data collected appears to contain application usage, internet browser history, and other information unrelated to MMS messaging.

**Disputes**

The dispute in the instant case revolves around a government proprietary program named "Coolminer." What the program does and what it does not do are the core concerns in defendants' motion to compel.

1. **Information Requested in the Motion to Compel.** Defendants seek information relating to the reliability of the Coolminer program and how Coolminer filters, organizes, and/or deciphers data. Specifically, defendants have sought information relating to any differences between what was collected by the government and what was disclosed to the defendants in the Coolminer and ExportLite Productions. The basis for this request is found at Raudel Macias' Motion to Compel Coolminer/ExportLite discovery. Dkt. Item 177.[5]

2. **Production of Packet Data in Native File Format.** The government has provided two sets of data, first in Coolminer format, then in ExportLite format. These productions are not actually the entirety of what was seized by the government, but exported content from the Coolminer program. In other words, the data received by the defense has been filtered (per the government's affiant for voice call data duplicative of captured wire communications) and analyzed for pertinence by human monitors using Coolminer. What the defense has received is data packets post-filter and post-Coolminer. Despite government representations to the contrary, defendants do not know that what has been received is the packet data in native file format. To figure out what Coolminer actually does the defense wishes to compare what was collected by the government and what was produced in the Coolminer and ExportLite productions.
   a. **Basis for the Request**: Fed. R. Crim. P. 16, subd. (a)(1)(E)(iii), provides that disclosure of "data" is discoverable if it is in the government's possession, custody, or control and: . . . the item was obtained from or belongs to the defendant.[6]
   b. **Why Defendants' Need This Information**: The Title III applications in this case indicate that seizure of packet data in this case was necessary for potential review of MMS text messages. *See, e.g.* TT1, Ex. 3, Decl. of Luis Leyva, at ¶ 149 (indicating that electronic communications are text messages); Wiretap

---

[5] All docket references are made to *United States v. Raudel Macias, et al.* 21-cr-26-EMC.
[6] Notably, the plain text of Rule 16(a)(1)(E)(iii) does not impose a requirement of materiality for disclosure.

Application 2 ("TT2"), Ex. 3, Decl. of Luis Leyva at ¶ 200 (same). Defendants may seek suppression under Title III for an order that is "insufficient on its face" or that interception was not made "with the order of authorization or approval." 18 U.S.C. §§ 2518(10)(a)(ii) and (iii). Here, it appears that the government seized a wide variety of defendants' data that was other than MMS messages. Defendants need the native file packet data to pursue claims that: a) there was insufficient probable cause and necessity to seize the packet data (*e.g.* that there was insufficient particularity in the application to justify the wholesale seizure of defendants' data); and/or b) that the seizure of the electronic data stream was outside the authorization of the warrant that described the electronic data stream as solely text messages. In short, defendants cannot make arguments about the improper scope of the seizure unless they know what was actually seized by the government.

3. **Access to Coolminer.** The defense has requested that a defense expert be allowed to view the packet data in this case using Coolminer to understand what the program can and cannot do. In making this request, the defense has stated a willingness to enter into any protective orders necessary to maintain the government's proprietary interest.[7]
    a. **Basis for the Request:** Fed. R. Crim. P. 16, subd. (a)(1)(E)(i) ("the item is material to preparing the defense").

    b. **Why Defendants Need This Information:** Defendants do not know exactly what Coolminer was used for in this case. The government's position is that Coolminer is simply a "government software program used for loading and viewing intercepted data." Dkt. Item 179 at 6, citing the Decl. of Robert Morton at ¶ 2. The government has also the position that Coolminer is unable to decrypt or decipher data. However, in *United States v. Armando Gonzalez,* 20-cr-85-JCH (D. Conn. 2021), a DEA Task Force Officer named Jeffery Poulin stated in a sworn affidavit essentially the opposite: that the contents of MMS messages in data packets are often viewed as "an undiscernible string of alpha-numeric digits" and that Coolminer, on a separate computer, was required to view the contents of the message received. In sum, the government first received data from the service provider and then filtered the data for phone calls and SMS texts captured in the wire data stream. That data was then "processed"[8] through Coolminer and provided to the defendants in the Coolminer and ExportLite productions. The request here is that a defense expert review the data collected by the government using Coolminer to see what information was originally received by Coolminer and what Coolminer did to produce the data ultimately disclosed to defendants. This is material to defendant's wiretap motion as described by the motion to

---

[7] That said, defendants note that Coolminer is a program that was developed over 20 years ago.
[8] Because defendants do not have an accurate idea of what Coolminer does, the generic term "processed" is used here.

compel (Dkt. Item 177) to attack the warrant on the grounds of improper minimization.

DATED: May 23, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

__/s/_____
DANIEL PASTOR
Assistant United States Attorney

DATED: May 23, 2022

Respectfully submitted,

_/s/_____
Peter Arian
Counsel for Raudel Macias