STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
daniel.pastor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUVENCIO GAMEZ CID,<br><br>Defendant. | Nos. CR 20-450-EMC<br><br>**GOVERNMENT OPPOSITION TO DEFENDANT CID'S MOTION TO SUPPRESS EVIDENCE DERIVED FROM WIRETAPS AND MOTION FOR *FRANKS* HEARING** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUVENCIO GAMEZ CID,<br><br>Defendant. | No. CR 20-451-EMC<br><br>Hearing Date: October 27, 2022<br>Time: 10:00 a.m.<br>Ctrm: 17th Floor, Ctrm. 5 |

# TABLE OF AUTHORITIES

## Federal Cases


*Franks v. Delaware*, 438 U.S. 154 (1978) ........................................ 15

*United States v. Baker*, 589 F2d 1008 (9th Cir. 1979) ........................................ 4

*United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000) ........................................ 4, 15

*United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001) ........................................ 3

*United States v. Canales Gomez*, 358 F.3d 1221–27 (9th Cir. 2004) ........................................ 15, 17

*United States v. Carneiro*, 861 F.2d 1171 (9th Cir. 1988) ........................................ 3

*United States v. Chavez-Miranda*, 306 F.3d 973 (9th Cir. 2002) ........................................ 16

*United States v. DiCesare,* 765 F.2d 890 (9th Cir.), amended, 777 F.2d 543 (9th Cir. 1985) ........................................ 16

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) ........................................ 12

*United States v. Forrester*, 616 F.3d 929 (9th Cir. 2010) ........................................ 2, 17

*United States v. Garcia-Cruz*, 978 F.2d 537 (9th Cir.1992) ........................................ 16

*United States v. Garcia-Villalba*, 585 F.3d 1223 (9th Cir. 2009) ........................................ 2

*United States v. Homick*, 964 F.2d 899 (9th Cir. 1992) ........................................ 15

*United States v. Ippolito*, 774 F.2d 1482–86 (9th Cir. 1985) ........................................ 3, 16

*United States v. Kiser*, 716 F.2d 1268 (9th Cir. 1983) ........................................ 15

*United States v. McGuire*, 307 F.3d 1196 (9th Cir. 2002) ........................................ 2, 15, 17

*United States v. Perdomo,* 800 F.2d 916 (9th Cir. 1986) ........................................ 16

*United States v. Pezzino*, 535 F.2d 483 (9th Cir. 1976) (per curiam) ........................................ 4

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) ........................................ 2, 3

*United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008) ........................................ 1, 2

*United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) ........................................ 12

*United States v. Spagnuolo*, 549 F.2d 705 (9th Cir.1977) ........................................ 4

*United States v. Steffani*, 226 F. App'x. 740, 2007 WL 901506 (9th Cir. 2007) (unpublished) ........................................ 16

*United States v. Vasquez*, 2010 WL 368792 (C.D. Cal. 2010) (unpublished) ........................................ 12

*United States v. Webster*, 734 F.2d 1048 (5th Cir. 1984) ........................................ 4

**Federal Statutes**

18 U.S.C. § 2510 ........ 1
18 U.S.C. § 2511 ........ 1
18 U.S.C. § 2512 ........ 1
18 U.S.C. § 2513 ........ 1
18 U.S.C. § 2514 ........ 1
18 U.S.C. § 2515 ........ 1
18 U.S.C. § 2516 ........ 1
18 U.S.C. § 2517 ........ 1
18 U.S.C. § 2518 ........ 1, 2
18 U.S.C. § 2519 ........ 1
18 U.S.C. § 2520 ........ 1

## I. INTRODUCTION

The United States hereby opposes Defendant Juvencio Cid's motion to suppress evidence derived from wiretap applications three (March 17, 2020) and four (June 4, 2020) on the ground that the government did not meet the necessity requirement. The Government also opposes Cid's request for a *Franks* hearing, based on the assertion that the government made intentional or reckless, and material, false statements and omissions about a Source of Information (hereafter "CS"), which if cured, would have negated necessity for the wiretaps. The government's wiretap affidavits do not contain intentional or reckless false statements or omissions that are material to a finding of necessity. Cid fails to make the substantial showing of intentional or reckless falsity of a statement or omission necessary to warrant a *Franks* hearing.

## II. BACKGROUND

From December 2019 through October 2020, the San Jose DEA conducted a series of five wiretaps in furtherance of an investigation into a drug trafficking group involving Defendants Francisco Ricardo Miranda, Gelacio Perez, Juvencio Gamez Cid, as well as other co-conspirators. During the third court-authorized wiretap, San Jose DEA initiated interceptions of telephones used by Francisco Miranda, Gelacio Perez, and another co-conspirator.

During the wiretap of a telephone used by Cid, the DEA learned that on or about June 25, 2020, Cid was seeking to purchase approximately 25 pounds of methamphetamine from a supplier then identified as Roberto Villalobos-Buelna (later determined to be Jose Alfredo Villalobos). Agents conducted surveillance of Villalobos and learned that Villalobos, along with his associate Sergio Villalobos-Cisneros traveled to Long Beach, California on June 24, 2020, to pick up approximately 25 pounds of methamphetamine for Cid. Based on the surveillance, agents seized 25 pounds of methamphetamine on June 25, 2020, as the methamphetamine was being transported to the Northern District of California.

## III. WIRETAPS AND THE "NECESSITY REQUIREMENT"

Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2520. "To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity." *United States v. Rivera*, 527 F.3d 891,

897 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 654 (2008). The "necessity requirement can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." *United States v. McGuire*, 307 F.3d 1196 (9th Cir. 2002).

The wiretap should not ordinarily be the initial step in the investigation, but "law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. Forrester*, 616 F.3d 929, 944 (9th Cir. 2010). The purpose of these requirements is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1227 (9th Cir. 2009).

**A. The Government's Right to Pursue An Effective Case**

"[N]ecessity for the wiretap is evaluated in light of the government□s need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *Id.* at 1228. An "effective case" means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." *Id.* The district court "has considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy." *United States v. Reed*, 575 F.3d 900, 909 (9th Cir. 2009), *cert. denied*, 130 S.Ct. 1728 (2010). The Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of other satellite conspirators." *Id.* at 909-10 (ellipsis omitted). The Ninth Circuit has explained that "[a] wiretap, which targets communications, is well-suited to unmasking the leaders of a narcotics trafficking organization." *United States v. Garcia-Villaba*, 585 F.3d 1223, 1230 (9th Cir. 2009).

**B. Legal Standard For Evaluating Motions to Suppress Wiretap Evidence**

The Ninth Circuit has adopted a two-prong approach in its analysis of an adequate showing of necessity:

> First, we review de novo whether a wiretap application is supported by a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c). If a wiretap is adequately supported, then we review the district court's necessity finding for abuse of discretion.

*Forrester*, 616 F.3d at 934 (internal citations omitted).

When reviewing whether the district court abused its discretion in approving a wiretap, the Ninth

Circuit has used a "common sense approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forgo such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *Reed*, 575 F.3d at 909. "Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the [necessity] provision envisions is that the showing be tested in a practical and commonsense fashion." *Id.* at 909.

Where, as here, a wiretap application is alleged to contain misstatements or omissions, the district court reviews the application and makes a determination of "whether it contains *material* misstatements or omissions regarding necessity." *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (emphasis added). "If an application contains inaccuracies or significant omissions, the court must determine the facts relying on credible evidence produced at the suppression hearing to determine whether a reasonable issuing judge could have denied the application because necessity for the wiretap had not been shown." *Id.* at 1208 (internal punctuation omitted). Where, as here, it is claimed that information not included in the wiretap application would have changed the necessity determination, "[i]t is necessary to evaluate the hypothetical effect of knowledge of the existence of a potentially useful informant on the original district court's determination that a wiretap was necessary. If it would have no effect, then the misstatement would not be material." *United States v. Ippolito*, 774 F.2d 1482, 1485–86 (9th Cir. 1985).

## IV. COURTS DO NOT INVALIDATE A WIRETAP ORDER BECAUSE A DEFENDANT IS ABLE TO SUGGEST SOME INVESTIGATE TECHNIQUE THAT COULD HAVE BEEN USED WITH THE BENEFIT OF HINDSIGHT

Defendant Cid's Motion attacks the wiretap affidavits for not seeking specific pieces of process at various points during the investigation. The Motion also counter-intuitively suggests that the Oakland DEA investigation's inability to ferret out Cid's drug trafficking cuts against the necessity showing made in the San Jose investigation's wiretap applications. The Ninth Circuit has found unpersuasive defendants' arguments "with the benefit of hindsight" about "alternative ways that the DEA could have pursued its investigation." *United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988). "The fact that the DEA could have taken different or some additional steps in its investigation does not demonstrate that the district court abused its discretion in upholding the wiretap order." *Id.* (citing

*United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.1984) (courts will not invalidate a wiretap order because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not)).[1]

On the contrary, the Ninth Circuit has explained that "[g]overnment investigators, subject to evaluation by the court on similar bases, are entitled to use reason and common sense in the performance and documentation of their investigations to support applications for wiretaps." *United States v. Baker*, 589 F2d 1008, 1013 (9th Cir. 1979). The wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to the point where the investigation becomes redundant or impractical or the subjects may be alerted . . ." *Id.*; *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (same).

## V. THE INVESTIGATION TIMELINE AND THE CS

The CS is referred to as "SOI-1" in Wiretap Affidavits Four and Five. The CS was deactivated by a Mexico DEA office in September 2019 and was not an active confidential source with the DEA during the time the San Jose DEA applied for wiretap three and wiretap four in this investigation. The CS was not re-established as an active confidential source[2] with the DEA until February 2021.[3]

Much, if not all, of the information that the CS provided to the investigation of this case was either: (1) already known to the DEA, or (2) could not be independently corroborated. Declaration of Kevin Li ("Li Decl.) ¶ 4. The CS was discussed in the necessity section of wiretap affidavits four and five because he/she was a CS with whom DEA San Jose communicated with during the course of the investigation, even though the CS relayed information that DEA already possessed. *Id.* The CS was not re-established as an active DEA confidential source until February 2021. *Id.* The CS did not return and remain in the United States until January 2021. *Id.* n.2.

---

[1] *See also United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977) (the necessity requirement does not require law enforcement officers to exhaust all possible uses of ordinary investigative techniques); *United States v. Pezzino,* 535 F.2d 483, 484 (9th Cir. 1976) (per curiam) (the necessity requirement can be satisfied even though the police failed to use one type of normal investigative technique), *cert. denied,* 429 U.S. 839 (1976).

[2] DEA will not generally use a CS for proactive investigations (such as controlled purchase or other operational activity) when the CS does not have a valid means to legally stay in the United States.

[3] The CS did not formally return to the United States until January 2021. The CS stopped working with the DEA in 2022.

**A. The CS and Investigation of Gelacio Perez**

During the third wiretap, agents intercepted telephones used by Francisco Miranda, Gelacio Perez, and another co-conspirator. Li Decl. ¶ 5. During an intercepted call on March 20, 2020, San Jose DEA first learned about a second telephone number used by Gelacio Perez. *Id.* San Jose DEA conducted an internal DEA database search on this number and learned that the CS had previously mentioned the same telephone number (ending in -4452) during a debrief in 2018. *Id.* ¶ 6.

Agents learned that a DEA agent in Los Angeles debriefed the CS at the Los Angeles Airport (LAX) on August 9, 2018. Li Decl. ¶ 6. During that debrief, the CS told the agent that the user of the phone number used the alias "El Papo" and was an alleged cartel affiliate responsible for trafficking 50-100 kilograms of methamphetamine to Northern California at a time. *Id.*

On March 22, 2020, San Jose DEA contacted the agent in Los Angeles, and was informed that the CS did not provide any further information about "El Papo." Li Decl. ¶ 6. Los Angeles agents did not know who "El Papo" was and were unable to corroborate any of the CS's assertions about "El Papo." *Id.*

On or about March 23, 2020, San Jose DEA also contacted the San Francisco Field Division's Confidential Source coordinator about the CS. Li Decl. ¶ 7. Agents learned that the CS had previously been an active informant in Mexico but had been deactivated since September 2019. *Id.* Agents also contacted the CS's former handlers and were informed that the CS "was no longer established." *Id.* As a result, San Jose DEA at the time did not expend further investigative resources on the "El Papo" lead and diverted its attention towards more actionable leads. *Id.*

**B. San Jose DEA Learns of Cid (aka Alex Torres) in March 2020**

During the third wiretap period, San Jose DEA also learned of the user of telephone number [REDACTED] [REDACTED] (referred to as Target Telephone 7 in the affidavits)—Juvencio Gamez Cid (referred to as Alex Jose Torres-Carrero in the affidavits)—who, based on intercepted calls, appeared to be another drug source of supply for Perez. Li Decl. ¶ 8. Internal DEA database checks eventually led to deconfliction with the Oakland DEA investigation into Cid. San Jose DEA learned from Oakland DEA that the almost nine-month-long investigation into Cid had stalled. *Id.* Oakland DEA was considering pursuing a wiretap of Cid's telephones. *Id.*

**C. San Jose DEA Learns New Phone Numbers for the Miranda DTO in April 2020**

During the third wiretap period, on April 9, 2020, San Jose DEA conducted an enforcement action against the Miranda DTO resulting in the arrest of Miranda's co-conspirator Rojas. Li Decl. ¶ 9. Miranda and Perez both "dropped" their phones (discontinued use of the wiretapped phones) in the days and weeks after the enforcement action. *Id.* A San Jose DEA intelligence analyst conducted replacement phone analysis and eventually identified replacement phones for Miranda [redacted] and Perez [redacted].[4] *Id.* San Jose DEA applied for and was granted GPS Ping warrants for these replacement phones on April 24, 2020. *Id.*

**D. San Jose DEA Learns the CS is in the United States in April 2020**

Around April 24, 2020, interest in the "El Papo" lead resurfaced. Li Decl. ¶ 10. A San Jose DEA intelligence analyst told investigators that Perez's -4452 phone was in communication with a telephone previously suspected to be associated with an individual with high investigative interest. *Id.* Upon learning the name of the individual, San Jose DEA investigators realized that the individual of high investigative interest was the CS. *Id.* San Jose DEA then contacted the CS's former handlers inquiring about the CS's presence in the United States and the CS's communications with an active target. *Id.* ¶11.

At that point, San Jose DEA investigators were informed that the CS was present in the country on a Significant Public Benefit Parole (SPBP) sponsored by a Homeland Security Investigations (HSI) agent in Chicago. Li Decl. ¶ 11. San Jose DEA was informed that the CS's SPBP had terminated and that the CS had overstayed his/her parole as he/she was recovering from COVID-19. *Id.* San Jose DEA was informed that the CS had been ordered to self-deport to Mexico, and did not have a valid means to legally stay in the country. *Id.* San Jose DEA was told that the Chicago agent was unable to effectively direct the CS remotely and had elected to discontinue the SPBP. *Id.*

San Jose DEA decided to speak with the CS and evaluate if the CS could be helpful in its investigation. Li Decl. ¶ 12. The CS's former handler gave San Jose DEA investigators the contact information for the CS. *Id.* San Jose DEA then arranged an initial debriefing meet with the CS that occurred on May 7, 2020. *Id.* This was San Jose DEA's first contact with the CS. *Id.*

---

[4] It appeared that the phone number ending in 4452 was PEREZ's personal or "clean" phone as he continued using it even after dropping his other "dirty" phone. Li Decl. ¶ 4 n.4.

**E. San Jose DEA Meets with the CS on May 7, 2020**

During the May 7, 2020 meeting,[5] the CS provided San Jose DEA investigators with phone numbers and names of several different alleged drug traffickers. Li Decl. ¶ 13. The CS provided a known phone number and license plate for a known vehicle[6] used by "Panchito" (who investigators surmised to be Francisco Miranda). *Id.* The CS also provided a known phone number for "Jose Emilio Colon" (who investigators surmised to be Juvencio Gamez Cid), and also told investigators that a man named "Alfredo Villalobos-Cisneros," using phone number ██████████, was a drug trafficker. *Id.* The CS also provided historical information about Miranda and Cid's drug trafficking activities. *Id.*

Most of the information that the CS provided simply corroborated information already known to San Jose DEA, or the information could not be independently corroborated or substantiated at the time it was provided. *Id.* Further, the CS lacked valid immigration status at this time, which raised additional investigative challenges. *Id.*

**F. The CS's Information about Perez**

During the May 7, 2020 meeting, the CS was also questioned about the "El Papo" debrief at LAX, and the CS appeared initially reluctant to reveal this information. Li Decl. ¶ 14. The CS was reminded of the debrief in 2018 that occurred at LAX. *Id.* The CS was told to input the number ending in -4452 into the CS's telephone, and the CS observed it was saved in the CS's phone. *Id.* After further questioning, the CS eventually told San Jose DEA that the CS knew "El Papo" to be "Gelacio."[7] *Id.*

Agents decided to have the CS substantiate the claimed access to Perez by having the CS call Perez. Li Decl. ¶ 15. The CS called Perez and asked about purchasing cocaine and methamphetamine. *Id.* During the phone call, Perez told the CS that he did not have any at the moment. *Id.* Given agents' knowledge of the close ties between Miranda, Perez and Cid, agents did not direct the CS to attempt to call any other of the drug traffickers mentioned in the debrief. *Id.*

\\

---

[5] The CS also provided some of this information telephonically in the days following the initial May 7, 2020 meeting.

[6] San Jose DEA previously installed a tracker on this vehicle in February 2020.

[7] The CS had not previously told Los Angeles DEA that "El Papo" was Gelacio.

### G. The CS's Information about Cid

The CS also provided information about a drug trafficker named "Chupon," (who San Jose DEA investigators surmised to be Cid based on the phone number) who was using the alias "Jose Emilio Colon." Li Decl. ¶ 16. During a prior debrief in 2019 in Mexico, the CS had provided the name, Jesus Emilio Colon Martinez rather than "Jose Emilio Colon" and had said that Jesus Emilio Colon Martinez was a large-scale methamphetamine trafficker in San Jose, California. *Id.* San Jose DEA investigators were already aware that Cid was operating out of Newark, California. *Id.* The CS also provided an already-known phone number for Cid (the number ending in -6215), and stated generally that Cid was a large-scale drug trafficker. *Id.* ¶ 17.

The CS did not provide any information about Cid's drug suppliers or specifics on Cid's drug trafficking operation. *Id.* ¶ 17. The CS told agents about an instance in 2008 during which Cid was robbed of several hundred kilograms of methamphetamine. *Id.* Agents, however, were unable to substantiate this claim and found this information generally unhelpful towards achieving the goals of this investigation. *Id.*

### H. The CS's Information about "Lobo" and the Investigation into Villalobos

The CS also provided information about a large-scale drug trafficker named "Alfredo Villalobos-Cisneros" who used the alias "Lobo." Li Decl. ¶ 18. The CS stated that "Lobo" used the phone number 408-380-9974. *Id.* However, the CS did not provide any information that "Lobo" and Cid worked together, nor did the CS indicate to agents that "Lobo" was a drug source of supply to Cid. *Id.*

San Jose DEA had in 2018, intercepted the number ending in -9974 during the course of a Santa Clara County state wiretap.[8] Li Decl. ¶ 19. San Jose DEA knew the male user of the phone number ending in -9974 was a drug trafficker in 2018. *Id.* The user of the phone in 2018, however, was unidentified and referred to as the unidentified male using the number ending in 9974, "UM9974".[9] *Id.*

---

[8] The previous interception of this number was discussed in both application four and application five in the prior interceptions sections of the affidavits.

[9] The intercepted calls from 2018 were also generally unhelpful at the time given the staleness of the information. San Jose DEA investigators did not know who was using the phone ending in 9974 in 2020. San Jose DEA investigators did not have a voice for Villalobos to compare with the 2018 calls until after Villalobos's initial contact with law enforcement on June 25, 2020.

The information the CS provided about "Lobo" was generally unhelpful in the investigation. Li Decl. ¶ 20. Agents were unable to find an individual by the name of "Alfredo Villalobos Cisneros", and were unable to find any driver's license photographs matching that name to show to the CS. *Id.* Subscriber records for the number ending in 9974 indicated the phone was subscribed in the name of "Roberto Villalobos" and did not match the name "Alfredo". *Id.*

During the fourth wiretap, on June 25, 2020, and independent of information the CS provided, San Jose DEA eventually learned that Cid was seeking a shipment of 25 pounds of methamphetamine from the Unidentified Male user of the telephone number 408-701-8687[10] ("UM8687"). Li Decl. ¶ 21. Agents eventually located UM8687 in Southern California and observed UM8687 and his brother (later identified as Sergio Villalobos-Cisneros) retrieve a shipment of methamphetamine while in Southern California. *Id.* San Jose DEA had California Highway Patrol (CHP) initiate a traffic stop on UM8687's vehicle as he was departing Los Angeles. *Id.* Following the stop, San Jose DEA learned that UM8687 had provided the name "Roberto Villalobos-Buelna" to CHP officers, and provided the phone number 408-380-9974. *Id.* San Jose DEA later sought an arrest warrant for Villalobos under the name "Roberto Villalobos-Buelna." *Id.* San Jose DEA did not learn Villalobos's true name was "Jose Alfredo Villalobos-Cisneros" until he was arrested in November 2020 and San Jose DEA received an Integrated Automated Fingerprint Identification System (IAFIS) match to his submitted ten-finger print card. *Id.*

**I. CS Leaves the U.S. After the May 26, 2020 meeting with San Jose DEA**

San Jose DEA met with the CS again on May 26, 2020. Li Decl. ¶ 22. The CS provided agents with a phone number for a possible source of supply for Perez. *Id.* Agents, however, were unable to corroborate this information based on toll records for Perez's known telephones. *Id.* In the days following the meeting, the CS was ordered to self-deport to Mexico by his former handlers. *Id.* San Jose DEA began the process to sponsor a second SPBP for the CS in hopes of paroling the CS back into the United States for proactive use.[11] *Id.*

\\

---

[10] The CS also did not provide information about Villalobos's "dirty" phone (ending in 8687), and appeared to only know Villalobos's "clean" or personal phone number.

[11] San Jose DEA sought a SPBP based on the CS's potential usefulness for not only this investigation but other unrelated investigations.

**J. Cid Reaches Out to the CS**

The CS and one of Cid's predecessor phones had exchanged a few text messages in 2019 based on toll records for Cid's predecessor phones.[12] Li Decl. ¶ 23. On June 10, 2020, during the fourth wiretap period, San Jose DEA intercepted a text message from Cid to a phone suspected to be used by the CS's paramour. *Id.* ¶ 24. Cid asked if the user of the telephone had any friends that could provide Cid with "work," a term San Jose investigators knew to be slang for drugs. *Id.* No response was intercepted. *Id.* The CS did not report any contact to San Jose investigators. *Id.* Agents did not believe it prudent to ask the CS if the CS had received contact from Cid because it would alert the CS that a wiretap was underway. *Id.* The CS began using a Mexican phone number after the CS left for Mexico, and agents did not know who was using the phone that Cid contacted on June 10, 2020. *Id.*

**K. Cid Drops Target Telephone 7, and San Jose DEA Learns Cid's New Number**

During the course of the fourth wiretap, San Jose DEA conducted a series of enforcement operations on Cid's drug sources of supply leading to seizures of significant quantities of methamphetamine and arrests of some of the sources of supply. Li Decl. ¶ 25. On July 1, 2020, agents intercepted a call between Perez and Cid during which Cid told Perez he would be calling from a new phone number. *Id.* San Jose DEA later intercepted a call between Perez and Cid, who was using the new phone number [REDACTED] (Target Telephone 10 in wiretap application five). *Id.* Cid complained to Perez during this call about losing money to his suppliers after one of his suppliers got arrested. *Id.*

**L. The CS's Access to Cid is Verified**

On or about July 26, 2020, the CS contacted DEA San Jose agents and told them that "Chupon" (Cid) had contacted the CS using a new phone number—([REDACTED]. Li Decl. ¶ 26. The CS reported that Cid had asked the CS if the CS was able to help supply Cid with drugs. *Id.* Agents were aware however, that the CS's particular access to Cid would only be suitable for conducting a "reverse," wherein law enforcement agrees to furnish drugs to the target in exchange for money. *Id.* This type of operation would be of limited use, and would not help accomplish the investigation's goals of targeting Cid's drug suppliers. *Id.* Moreover, a "reverse" type operation would necessitate that investigators make

---

[12] Cid's known phones and the CS's known phones did not appear to have any sort of regular telephonic contact.

an arrest of the target shortly after the exchange, to prevent the further distribution of the furnished drugs. *Id.*

**M. The CS's SPBP is Granted but the CS Chooses to Stay in Mexico**

On August 25, 2020, the CS was paroled into the United States at the San Ysidro border. San Jose DEA agents traveled to the border to meet with the CS with the intention of completing official paperwork to activate the CS for proactive use. Li Decl. ¶ 27. The CS, however, informed them that the CS's personal situation had changed and the CS no longer wished to come to the United States; the CS returned to Mexico that same day. *Id.*

In the months that followed, investigators attempted to have the CS conduct a telephonic introduction of an undercover to Cid. *Id.* The CS did not comply with the request and an undercover was unable to make contact with Cid. *Id.* The CS requested to return to the United States in January 2021 after the CS's personal situation once again changed. *Id.* The CS became an active DEA informant in February 2021 following the CS's return to the United States. *Id.* The CS stopped working for the DEA in 2022.

**VI. ARGUMENT ABOUT THE CS AND NECESSITY**

Defendant's Motion suggests that the CS was a dependable and established cooperator who the case agents could have used proactively to investigate their targets instead of using a wiretap. *See* Mot. at 39. In reality, the CS was a fickle, on-again-off-again source of information (SOI) who was unwilling to engage in proactive operations.

Defendant's argument that the investigation's objectives could have been achieved with the CS is misplaced. "The Ninth Circuit . . . has time and again held that the mere availability of a confidential informant does not demonstrate the absence of necessity for a wiretap, even where that informant has already provided information to investigators." *United States v. Vasquez*, 2010 WL 368792 (C.D. Cal. 2010) (unpublished); *see also United States v. Shryock*, 342 F.3d 948, 976 (9th Cir. 2003) (several informants could not possibly reveal the full nature and extent of the enterprise and "its countless, and at times disjointed, criminal tentacles"), *cert. denied*, 541 U.S. 965 (2004); *United States v. Fernandez*, 388 F.3d 1199, 1236 (9th Cir. 2004) (same), *cert. denied*, 544 U.S. 1009 (2005).

\\

On March 16, 2020, at the time of Wiretap Application Three, the case agents had not spoken with the CS and were unaware the CS was in the United States. When the case agents learned the CS was in the U.S. in April 2020 and met with the CS about their investigation on May 7, 2020, they realized the CS has not been entirely forthcoming with Los Angeles DEA agents at the LAX debrief. Agents also knew that Homeland Security Investigations (HSI) had tried to work with the CS—and even paroled the CS into the United States—only to find the CS uncooperative so that HSI discontinued the relationship. On May 7, 2020, when the case agents met with the CS, the CS had already been ordered to return to Mexico and had significant public benefit parole discontinued.

During the May 7, 2020 meeting with the CS, agents questioned the CS about the LAX debrief and the CS admitted that the CS knew the person the CS identified at LAX as "El Papo" to be Gelacio Perez. The CS had Perez's phone number in the CS's phone. During the meeting, agents also had the CS call Perez and ask about purchasing cocaine and methamphetamine. With the agents listening in, Perez told the CS that he did not have any. Given the close relationships between Miranda, Perez, and Cid, agents decided not to have the CS attempt to call any of the other drug traffickers.

The CS's position was also such that having the CS attempt to buy cocaine or methamphetamine from the targets was not ideal. Agents knew that it would be more credible for the CS to offer to supply cocaine or methamphetamine to their investigative targets in what is called a "reverse." *See* Li Decl. ¶ 26. However, supplying drugs to the targets would have brought the investigation to a premature end. Arrests would need to be made soon after a transaction because the DEA may not introduce dangerous drugs into the community. *Id.*

Agents met with the CS again on May 26, 2020. At that meeting, the CS provided them with a phone number for a possible source of supply of Perez. However, the agents were unable to corroborate this tip based on toll records from Perez's telephones. In the days after the meeting, the CS was ordered to return to Mexico by his former HSI handlers.

On June 4, 2020, Wiretap Application Four stated that "agents had learned of an SOI that have previously provided information to the DEA in 2018 . . . in the hopes of receiving immigration benefits and or financial compensation." Appendix 4B at 77-78. The affidavit further stated that the "SOI was recently debriefed by agents in the United States, and reported that the SOI had access to Perez and

personally interacted with Perez." *Id.* at 78. Nonetheless, the affidavit explained that agents were unable to "use this SOI proactively to target Perez because of the SOI's immigration status" and that the SOI was "pending deportation and agents are unable to proactively use him with in the United States." *Id.*

On June 10, 2020, while the fourth wiretap was underway, San Jose DEA intercepted a text message from Cid to a phone suspected to be used by the CS's paramour. Cid asked if the user of the phone could provide Cid with "work," which agents knew to be slang for drugs. No response was intercepted, and the CS did not report any contact with Cid to San Jose agents. The case agents decided it would not be prudent to ask the CS about contact with Cid because it could alert the CS that a wiretap was underway. The CS had begun using a Mexican phone number once the CS returned to Mexico, and the agents did not know who was using the phone that Cid texted on June 10, 2020.

During the Fourth Wiretap, agents conducted a series of enforcement actions on Cid's drug source of supply leading to seizures of significant quantities of methamphetamine and the arrests of some of Cid's sources of supply. In July 2020, San Jose DEA intercepted a call between Cid and Gelacio Perez in which Cid explained he would be calling from a new number: Target Telephone 10 (510-767-5008) in Wiretap Application Five. San Jose DEA later intercepted a call between Cid and Perez on that new number. In the call, Cid complained to Perez about losing money after one of his suppliers was arrested.

On or about July 26, 2020, the CS contacted DEA San Jose agents and told them that "Chupon" (Cid) had contacted the CS using the new phone number. Cid had asked the CS to supply him with drugs. Agents knew that given the request and the CS's position, the CS would only be able to conduct a "reverse" wherein the DEA would provide drugs to a target for money. Such a reverse operation would not help accomplish the investigation's goals of identifying Cid's drug suppliers and would prematurely end the investigation by requiring Cid's arrest shortly after the exchange to prevent the further distribution of drugs. Accordingly, investigators did not pursue that course.

On September 21, 2022, Wiretap Application Five stated:

> In July 2020, the SOI also revealed to agents that he had current access to Torres (Cid). It was not until July 2020 that the agents realized that the SOI could still contact with Torres. While the SOI has demonstrated access to Torres, it does not appear that the SOI has any further information about other sources of supply that Torres may use, specifically "Piolin" or Popeye. Based on the previous wiretap of the Torres telephone,

> agents are aware that Torres appears to be an independent drug trafficker with several separate drug sources of supply, each with their own distribution and supply lines. The SOI has not provided information indicating the SOI is aware of other sources of supply used by Torres. Even if the SOI was currently willing to participate in undercover operations – which [SOI] is not – and assuming the agents could use the SOI to introduce an undercover agent to Torres, I do not believe the undercover agent would be able to achieve all the goals of the investigation without the use of interceptions. Much of the investigation into other supply lines used by Torres has stemmed from the use of interceptions, and it appears that each of Torres's supply lines are compartmentalized and are unaware of each other's existence.

Appendix 5 at 40-41 (¶¶ 124-25).

Defendant contends that the affidavit provided only general statements about why traditional investigative techniques would be insufficient (*see* Mot. at 44); however, the detailed explanation of why the CS could not have achieved the investigation's goals in Wiretap Application Five was more than adequate in explaining that even if the SOI had been willing to engage in proactive undercover operations – which the SOI was unwilling to do – those operations were unlikely to have met the investigation's goals of identifying Cid's multiple sources of drug supply. The fact that Cid was asking the CS to supply Cid with drugs was a clear indication to agents that the CS would not be able to achieve the investigation's goals of rooting out the drug organization by identifying Cid's other suppliers. *See United States v. Bennett*, 219 F.3d 1117, 1121 n.3 (9th Cir. 2000) ("We have consistently upheld similar wiretap applications seeking to discover major buyers, suppliers, and conspiracy members."); *id.* at 1122 ([T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap."); *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002) (we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to the apprehension and prosecution of . . . other satellite conspirators.") (internal quotation marks omitted).

In addition to being reluctant to second-guess the decisions of law enforcement on the conduct of criminal investigations, the Ninth Circuit has "stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy." *United States v. Canales Gomez*, 358 F.3d 1221, 1226–27 (9th Cir. 2004). "Wiretap evidence . . . compared to the word of an informant either in the field or in court, is the gold standard when it comes to trustworthy evidence." *Id.* at 1227. "The

truth-seeking function of [the] courts is greatly enhanced when the evidence used is not tainted by its immediate informant source and has been cleansed of the baggage that always comes with them." *Id.*

**VII. THE REQUEST FOR A *FRANKS* HEARING**

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that a search warrant is void where the defendant can show that (1) the affidavit supporting the warrant contains statements which are intentionally false, or which were made with reckless disregard for the truth; and (2) without the false statements, the affidavit lacks probable cause for issuance of the warrant. The *Franks* standard applies to Title III applications and orders. *United States v. Homick*, 964 F.2d 899, 904 (9th Cir. 1992).

Because affidavits are presumed valid, a defendant is entitled to a hearing on his allegations of falsity only upon "a substantial preliminary showing" that the statements in the affidavit meet the *Franks* standard. *Franks*, 438 U.S. at 155-56. Given the assumption of validity underlying a supporting affidavit, a party moving for a *Franks* hearing must submit "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171. Furthermore, the movant must show that any omitted information is material. *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983). The Ninth Circuit has established the following criteria to support a successful request for a *Franks* hearing:

> the defendant must allege specifically which portions of the warrant affidavit are claimed to be false [or which facts were omitted]; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; [and] (5) the challenged statements must be necessary to find probable cause.

*United States v. Steffani*, 226 Fed. App'x. 740, 741, 2007 WL 901506 (9th Cir. 2007) (unpublished), (citing *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986)).

The movant bears the burden of proof and must make a substantial showing to support the elements. United *States v. Chavez-Miranda*, 306 F.3d 973 (9th Cir. 2002) (upholding district court's refusal to grant an evidentiary hearing where movant failed to establish false statements by a preponderance of the evidence); *United States v. Garcia-Cruz,* 978 F.2d 537, 540 (9th Cir. 1992) (upholding district court's refusal to grant an evidentiary hearing where defendant did not establish that misstatements were intentional or reckless).

The Motion here fails to make the substantial preliminary showing that statements or omissions were intentionally false or made with reckless disregard for the truth. The Motion also fails to make the required showing that any omitted information is material in the sense that its inclusion could have led a reasonable district court judge to have denied the application on grounds that necessity had not been shown. *See United States v. Ippolito*, 774 F.2d at 1486 ("If it would have had no effect, then the misstatement would not be material."). The Motion recognizes it does not meet these standards when it argues that a *Franks* hearing is needed "to determine if the government knowingly or recklessly submitted false statements and omitted true ones." Mot. at 35 (emphasis added).

The Motion's key *Franks* claim is that the "Wiretap 4 Affidavit minimized the importance of [the CS] and gave the false or misleading assertion that his usefulness was limited because he was going to be deported." Mot. at 35. With the benefit of hindsight, this claim is essentially an attempt by the defense to second guess the case agents' decisions on the conduct of the investigation. The argument is based on conjecture about what the defense believes the CS could have done for the investigation. But the government "need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. Forrester*, 616 F.3d 929, 944 (9th Cir. 2010). The CS would not have been able to achieve the goals of the investigation, and the CS had been ordered to return to Mexico at the time the Wiretap Four Application was submitted. In addition, agents had been unable to confirm the information the CS provided at their meeting on May 26, 2020. Whatever additional information agents could have provided at that point—and there was doubt about what information from the CS was reliable—would not have had a material impact on the necessity determination. *See Canales Gomez*, 358 F.3d at 1226 ("The government need not show that informants would be useless in order to secure a court-authorized wiretap."); *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir.2002) (holding that the government had established necessity for wiretaps despite its use of three cooperating witnesses because "those witnesses were able to give agents only limited information, not including the names of all members of the conspiracy").

## VIII. CONCLUSION

Based on the foregoing, the defendant's motion to suppress wiretap evidence and for a *Franks* hearing should be denied.

\\

DATED: September 23, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

_/s/ *Daniel Pastor*____________
DANIEL PASTOR
Assistant United States Attorney