BRIAN P. BERSON, Esq.
Attorney at Law, State Bar No. 130249
1000 Brannan Street, Suite 488
San Francisco, CA 94103
brian@bersonlaw.net
Telephone: (415) 788-2707
Facsimile:  (415) 522-1506

Attorney for Defendant
Juvencio Gamez Cid

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>vs.<br><br>Juvencio Gamez Cid, et al.<br><br>         Defendants. | No. CR 20-450 EMC<br><br>**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT CID'S MOTION TO SUPPRESS EVIDENCE DERIVED FROM WIRETAPS; MOTION FOR *FRANKS* HEARING** |
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>vs.<br><br>Juvencio Gamez Cid, et al.<br><br>         Defendants. | No. CR 20-450 AND 20-451 EMC<br><br><br>Date:  October 27, 2022<br>Time: 10:00 a.m.<br>Courtroom: The Honorable Judge Chen |

## INTRODUCTION

In our opening brief, we pointed out that discussion of SOI-1[1] was completely omitted from Wiretap Affidavit Three (Appendix 3 to dkt. 111) and, in Wiretap Affidavit Four (Appendix 4 to dkt.

---

[1] We referred to this informant as ▇▇▇▇▇▇▇, as he was identified on DEA-6s. The government's Opposition refers to him as SOI-1, which we now adopt in order to avoid further confusion.

1

*U.S.A. v. Juvencio Gamez Cid*, 20-cr-450 and 20-cr-451 EMC

111), was minimized regarding: 1) his wealth of knowledge about Perez; 2) omission of the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 3) omission of any mention of the informant's intimate knowledge of Miranda (who had told the informant that he moved cocaine all over the country and was tasked with setting up shops in Alabama and San Jose, CA); 4) omission of any mention of SOI-1's familiarity with Movant, including contacts with a prior phone number and knowledge of personal drug dealing particulars, and, 5) omission of SOI-1's familiarity with Villalobos. Dkt. 111, at pp. 19 – 27.[2] We furthermore pointed out that the false or misleading claim in Wiretap Affidavit Four that SOI-1's usefulness was compromised due to his immigration status due to the availability of an S-visa, "a tailor-made mechanism to keep (the informant) from being deported." *Id*. at pp. 27-31.[3]

Rather than directly disputing most of the above facts in its Opposition, the government resorts to contradictory explanations and questionable rationales to explain its failure to disclose the existence of the informant in Wiretap Affidavit 3, and as to Wiretap Affidavit 4, its failure to utilize – or even adequately disclose the existence of – this valuable asset. The informant was "fickle" (dkt. 119, at p. 11), "unwilling to engage in proactive operations" (*id*.), "no longer established" (*id*.), "lacked valid immigration status" (*id*. at p. 10), "most of the information [he] provided simply corroborated information already known … or the information could not be independently corroborated …" *Id*. As we will show below, these explanations are purposefully vague, don't add up or explain why, when Agent Leyva told Judge Illston that wiretaps were necessary, she wasn't told

---

[2] Note: page references are to the page number at the bottom of the cited pleading, rather than the pdf page number, which includes tables.

[3] We also asserted that the government manufactured necessity by setting overly broad, unrealistic goals that could never be met by traditional investigative techniques, (dkt. 111, at 39-41), and that the government relied on generalizations about the inherent limitations of traditional investigative techniques in claiming necessity for the wiretaps. *Id*. at 41-44. The Opposition addressed neither argument.

that the government had an informant available who was personally familiar, on a drug dealing basis, with four of the top players in the drug conspiracies it was investigating.

### THE CLAIM THAT SOI-1'S INFORMATION WAS ALREADY KNOWN OR COULDN'T BE VERIFIED.

It is noteworthy that the Opposition relies mostly on a declaration from Agent Li, not the affiant on the challenged wiretap applications. Apparently, the government believes that it can bolster the credibility of one affiant with that of another.

According to Agent Li, "much, if not all, of the information that the CS provided as it pertains to this investigation was either, 1) already known to the DEA, or, 2) could not be independently corroborated." Li Declaration, para. 4. Not so. This informant provided information about El Papo, who turned out to be Perez, two years before the DEA requested a wiretap on him, including that he was a big-time drug dealer working for the ███████████████████████████ who regularly traveled from ████████ Mexico to Los Angeles to verify quantity and quality of 50–100-kilogram shipments of methamphetamine destined for Northern California. Dkt. 111, Ex. 2, para. 2 (DEA-6 prepared August 10, 2018). The informant provided El Papo/Perez's phone number, verified two years later by DEA. *Id.*

This was well before Wiretap Affidavit 3, which named Movant as a potential interceptee. SOI-1 was not even mentioned in that wiretap affidavit.

Moreover, Li pointed to no information that any of the many things SOI-1 told the DEA about numerous drug dealers - on this case and others - turned out to be false, with the minor exception of telling DEA that Movant was in San Jose instead of Newark, Ca. (Dkt. 119, at p. 11). The fact that just about everything the informant told the DEA that could be confirmed was confirmed, was an indication of trustworthiness as to those things it couldn't verify. How could the DEA possibly verify

3

that El Chupon (Movant) was robbed of several hundred kilograms of methamphetamine? (Li Dec., at para. 17.) Did they think El Chupon would report such a robbery to the police?

### THE CLAIM THAT THE INFORMANT'S INFORMATION ABOUT VILLALOBOS COULDN'T BE VERIFIED.

In our opening brief (dkt. 111), we pointed out that SOI-1 had identified ▮▮▮ drug dealing member Alfredo Villalobos-Cisneros on May 7, 2020,[4] providing his phone number (ending in ▮▮▮), and that two weeks before Leyva's Wiretap Four Affidavit, Agent Li analyzed the contents of a search warrant return on Movant's phone number and found that he had exchanged apparent drug purchase texts with the ▮▮▮ phone number, in which Villalobos was the putative seller. Dkt. 111, at 23. Although the texts were revealed to Judge Illston, SOI-1's familiarity with Villalobos was not. Neither was the fact that the DEA had discovered contacts between one of Movant's predecessor phones and ▮▮▮ as early as August 28, 2019. Other than the texts Li found, the only thing revealed about ▮▮▮ in Wiretap Affidavit 4 was that he had been intercepted in a February 2018 Santa Clara Superior Court authorized wiretap but had not been identified. Judge Illston wasn't even told that the DEA was an active participant in that wiretap investigation. *Id*. at pp. 28-29.

In Agent Li's affidavit in support of the Opposition, paragraphs 18-21, he dismissed SOI-1's helpfulness about Villalobos, because, 1) SOI-1 provided no information that Villalobos and Movant worked together or that Villalobos was a source of supply (hereafter SOS) to Movant; 2) the user of the phone in 2018, ▮▮▮, was unidentified; 3) the 2018 interceptions were stale; 4) they didn't have a voice to compare with the 2018 interceptions until June 25, 2020; 5) subscriber records for the ▮▮▮ phone were in the name of Roberto Villalobos, not Alfredo. Li Dec., at para. 18-21.

---

[4] Villalobos ended up being charged as Movant's source of supply for a June 25, 2020 drug delivery interception made by the wiretap.

4

These are absurd excuses for not taking obvious investigative actions and failing to report most of it to the authorizing judge, instead of telling her that wiretaps were necessary. First, Agent Li appears to have forgotten that he, himself, confirmed that Villalobos was an SOS to Movant. Second, the user of the ▇ was identified – by SOI-1. Did DEA seriously think that the informant actually didn't know the SOS because his name (according to SOI-1) was Alfredo Villalobos instead of the phone number's subscriber record name of Roberto Villalobos? It was the same last name, same phone number, and a drug dealer in touch with Movant, in 2020 and 2017.[5] Third, the 2018 recordings were not so stale that they couldn't have been played for SOI-1, who then could have been asked, "Is this Alfredo?"

SOI-1 knew Movant. He had confirmed phone numbers for Movant. He provided detailed information about Movant.[6] He also knew Villalobos, Villalobos' phone number and drug dealing details about him. According to Li's declaration, SOI-1 didn't "provide any information alleging that 'Lobo' and CID worked together [or] that 'Lobo' was a drug SOS to CID." Did they even ask the informant? That's not revealed in the declaration. Supposing the informant didn't know the business connection between Movant and Villalobos, it wouldn't have prevented the DEA from having the informant contact Movant in controlled calls and asking whether he could get some drugs and the SOI-1 would join the financing. Also, the informant could have placed controlled calls to Villalobos to ask for a drug shipment. And, there was nothing to prevent the DEA from requesting tracking and PRTT warrants on the ▇ phone, which they only did on October 20, 2020, shortly before his November arrest. (*See*, dkt. 111, at p. 27.) All of these were traditional law enforcement techniques, less intrusive than the wiretaps that were said to be necessary.

---

[5] The 2017- 2018 contacts were found by affiant ▇▇▇▇▇▇ in the DEA de-confliction databases in 2017 (dkt. 111, p. 24), but not disclosed in Wiretap Affidavit 4.

[6] The informant's familiarity with Movant was not disclosed in Wiretap Affidavit Four.

Moreover, DEA knew in November 2017 that ▮▮▮▮ was in contact with Movant. *See* Dkt. 111, at pp. 24-25. Santa Clara DEA Task Force wiretap applications in December 2017 and January 2018 included declarations that ▮▮▮▮ was in communication with "Chilango" (Movant) in 2017 about potential drug sourcing. See, *id*. at p. 26.

### THE CLAIM THAT THE DEA COULDN'T USE SOI-1 BECAUSE OF HIS STATUS.

In his declaration, Li admits that when San Jose DEA agents learned of the above-noted 2018 disclosures by SOI-1 about Perez/El Papo – which were not disclosed in Wiretap Affidavits 3 or 4 – the agents tried to track the informant down. Li Dec., at para. 6-7. However, they learned that the informant had been "deactivated since ▮▮▮▮ and "was no longer established." He was not "re-established as an active confidential source with the DEA until ▮▮▮▮ Li Dec., at para. 3; footnotes *omitted*. In footnotes, the agent linked the active/inactive status to immigration status. The informant was said to not be "re-established until ▮▮▮▮ *Id*.

So, the San Jose DEA agents went looking for SOI-1, and they learned (according to Li) from the Los Angeles DEA that SOI-1 didn't provide further information about "El Papo." *Id.* at para. 6. That is not credible, at least not without a detailed explanation. The informant had El Papo's phone number and told the DEA that El Papo was high level in ▮▮▮▮, traveled regularly from ▮▮▮▮, Mexico to Los Angeles to check on methamphetamine shipments and was responsible for trafficking 50-100-kilograms at a time to Northern California. How can it be that he provided no further information? Wasn't he asked where he got this type of information? Who are El Papo's associates? What's his real name? Where does he live? Who with? Has he ever been arrested? If so, by who, when and where? What kind of car does he drive? How does he travel from ▮▮▮▮ Mexico to Los Angeles? Does he travel with anybody? Who does he deal with in Northern California? Who pays him? How much? Have you, informant, helped out on any of these trips? If so, how? How much

were you paid? By whom and in what manner? Did the informant refuse to answer such questions, or was he never asked them? It's hard to believe that no questions of obvious importance were asked. Yet, Li's Declaration is silent other than to say that SOI-1 provided no further information. In a case where the defense seeks a *Franks* hearing based on misinformation about an informant, this response raises more questions than it answers.

The defense was able to figure out that SOI-1 is ▮▮▮▮▮▮▮▮▮▮▮▮ If so, was the ▮▮▮▮ ▮▮▮▮▮▮ the reason for the paucity of information? Did the informant refuse to inform on ▮ ▮▮▮▮ any further than telling DEA that he's a multi-kilogram methamphetamine dealer for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who travels regularly from ▮▮▮▮▮ to Los Angeles because he's responsible for regular shipments from Los Angeles to San Francisco? For somebody he's supposedly reluctant to inform on, he gave up a lot of damaging information.

According to Li, after learning that this possessor of high-level intelligence about a key target was "no longer established" and that the last they heard he was in ▮▮▮▮▮▮, Mexico, the agents decided to not waste their time pursuing SOI-1 and "diverted their attention towards more actionable leads." Li Dec., at para. 7. That was on or about March 23, 2020.

Barely one month later, it turned out that SOI-1 was in the United States after all, working for HSI in ▮▮▮▮▮ He was in ▮▮▮▮▮ on an SPBP that had already expired, and he was overstaying his SPBP parole because he was recovering from COVID-19. *Id*. at para. 11.

Throughout Li's Declaration and the government's Opposition, they rely on SOI-1's lack of immigration status as a key reason that he couldn't be fully utilized. Two examples: "DEA will not generally use a CS for proactive investigations (such as controlled purchase or other operational activity) when the CS does not have a valid means to legally stay in the Unites States." Dkt. 119, at p. 4, fn 2; "(f)urther, the CS lacked valid immigration status at this time, which raised additional

7

*U.S.A. v. Juvencio Gamez Cid*, 20-cr-450 and 20-cr-451 EMC

investigative challenges." Li Dec., para. 13. However, both pleadings continuously cite the SPBP visa program, a general immigration parole program designed for a multitude of circumstances, including anything that can fit under the rubric of humanitarian, refugee and other public benefit issues.[7] The government never addresses the S-Visa program we cited in our opening brief (dkt. 111, at p. 30), a program designed specifically for informants with immigration issues, such as SOI-1.

Furthermore, under either program, the government had within its means the ability to apply for a waiver of immigration issues on behalf of its informant. Instead, it cites a problem that was entirely within its power to rectify as an excuse to not be able to use a valuable informant. The continuous citing of the informant's immigration issues as an excuse to not be able to utilize his services is thus a red herring.

### THE CLAIM THAT THE GOVERNMENT COULD NOT USE SOI-1 BECAUSE HE WAS UNRELIABLE.

On page 11 of its Opposition (dkt. 119), the government states that "the CS was a fickle, on-again-off-again source of information (SOI) who was unwilling to engage in proactive operations."[8] Yet, the DEA once again employed him as "an active … informant in ▓▓▓▓▓▓ following the CS's return to the United States." Li Dec., at para. 27.

This informant was supposedly reluctant to inform on Perez ▓▓▓▓▓▓ when the DEA asked him to do so on May 7, 2020. *Id*. at para. 14. Yet, that same informant readily supplied

---

[7] *See:* IRAD Parole Overview (uscis.gov): chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.uscis.gov/sites/default/files/document/presentations/9-IRAD-Parole-Overview.pdf

[8] In support of its assertion, the government cites SOI-1's supposed unwillingness to do a telephonic introduction to Movant after August 25, 2020. Opposition, dkt. 119, at p. 11. This is well after the time period of the wiretap affidavits and applications our motion to suppress addresses. Wiretap affidavit 3 was submitted on March 17, 2020. Affidavit 4 was filed on June 4, 2020. Similarly, the government puts forth an explanation of why its necessity showing in Wiretap Application Five was "more than adequate." Opposition, dkt. 119, at p. 14. Whether or not accurate, this is irrelevant to our challenges to Applications Three and Four.

8

detailed, high-level information about the same man two years earlier, information that his then-handlers apparently asked no follow-up questions about. That reluctance is nowhere to be found in the debrief about it. What is included in this debrief was a controlled call to the ▇▇▇ drug dealer, a call that for some reason was not recorded. Additional undercover calls were not attempted. "San Jose DEA investigators did not direct the CS to attempt to call any other of the drug traffickers mentioned in the debrief" (Li Dec., para. 15). None of this was disclosed to Judge Illston in Wiretap Affidavits Three or Four, who might have asked why they weren't trying to get more from this well-placed informant.

How unreliable was this informant? He started working for DEA no later than August 9, 2018. *See,* Dkt. 111, at p. 19. He provided detailed information about high level drug dealers on a regular basis, including – but far from limited to - four of the key players in the charged conspiracies of this case: Movant, Perez, Miranda and Villalobos. Contrary to the government's assertions that he only provided information it was already aware of or couldn't confirm, he told the DEA about Perez/El Papo and he provided his phone number to them before they had other information about him. Even though he may be ▇▇▇▇▇▇▇▇, he readily informed on him, including making a controlled phone call to him in front of DEA agents. (Li Dec., para. 15). He provided detailed information about Villalobos that the government foolishly decided not to use, even though opportunities to do so were readily apparent. On February 25, 2019, he told DEA agents about a drug trafficker in San Jose and provided them with his phone number at the time. The alleged trafficker was later identified as Movant. (Dkt. 111, Ex. 1, para 3). The government has not refuted one piece of information provided by SOI-1, but for the assertion that he said Movant trafficked in San Jose when DEA was aware that Movant was "out of Newark, California." Li Decl., para. 16. Newark is less than 20 miles from San Jose.

Controlled calls were never made to Villalobos even though DEA knew that he was a supplier to Movant. SOI-1 was in a position to call both Villalobos and Movant. No PRTT or tracking warrants on Villalobos were requested prior to Leyva telling Judge Illston that wiretaps were necessary. She was never told that DEA had an informant with access to both the SOS and buyer when she was told that there was necessity for Wiretap Applications Three and Four. She was never told how connected the informant was to Perez in those wiretap applications. In fact, she wasn't told anything about SOI-1 in Wiretap Application Three.

## CONCLUSION

No real effort was made to utilize an important informant who Judge Illston was not fairly told about. That utilization could have been done directly through controlled calls to - and meetings with - any or all of the four key players that the informant knew well. That utilization could also have been done indirectly with PRTT and ping warrants on Villalobos' phone, which DEA knew was being used by a potential SOS to Movant, a phone that had been in touch with Movant dating back to 2017, according to its own internal DEA de-confliction databases.

Wiretap Affidavits Three and Four are loaded with overly broad, unrealistic goals that could never be met by traditional investigative means. They are also loaded with generic limitations of traditional investigative means to justify wiretaps that would not have been authorized if they'd been fairly and accurately presented, with full and frank disclosure of SOI-1's capabilities and availability.

There are too many holes in the necessity applications of wiretap applications three and four. There are too many contradictions and empty rationales in the government's attempts to explain them away. This Court should order a *Franks* hearing so that the issues can be fully and fairly explored.

Dated: October 10, 2022                                  Respectfully submitted,

                                                                                                                                                              /S/ Brian P. Berson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brian P. Berson,
Attorney for Juvencio Gamez Cid